Filed 3/28/13  P. v. Reed CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| **THE PEOPLE,**<br><br>    **Plaintiff and Respondent,**<br><br>        v.<br><br>**TYRONE LAMONT REED,**<br><br>    **Defendant and Appellant.** | **A133225**<br><br>**(Alameda County<br>Super. Ct. No. C156325)** |

A jury convicted appellant Tyrone Lamont Reed of multiple sex offenses against his minor daughter Dianne.[1]  In a prior appeal, this court reversed the judgment of conviction and remanded the case, concluding the trial court erred by failing to inquire into Reed's reasons for "a motion for incompetence of counsel" he sought to make at his sentencing hearing.  (*People v. Reed* (2010) 183 Cal.App.4th 1137, 1141, 1143-1149 (*Reed I*).)  On remand, the trial court reinstated the judgment, and Reed appeals, contending:  (1) the trial court violated this court's directions in *Reed I* and abused its discretion in failing to rule on his motion for new trial; and (2) the trial court improperly limited the scope of appointed counsel's representation, depriving Reed of his right to

---

[1]  Reed is not Dianne's biological father but was in a relationship with her mother at the time she was born and agreed to act as her father.  Dianne believed Reed was her biological father at the time of the offenses discussed herein.

counsel and due process. We find no merit in either of these contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A jury convicted Reed of the following offenses: two counts of aggravated sexual assault of a child under age 14 — rape (Pen. Code, §§ 269, subd. (a)(1), 261, subd. (a)(2)),[2] one count of aggravated sexual assault of a child under age 14 — sodomy (§§ 269, subd. (a)(3), 286, subd. (c)(2)), one count of aggravated sexual assault of a child under age 14 — oral copulation (§§ 269, subd. (a)(4), 288a, subd. (c)(2)), one count of forcible oral copulation (§ 288a, subd. (c)(2)), one count of forcible rape (§ 261, subd. (a)(2)), and one count of misdemeanor child abuse (§ 273a, subd. (b)).

### *Trial*

Dianne testified that the alleged offenses occurred while she was sharing a room at the California Hotel with Reed, his "baby mama" (Bahati), and Bahati's father in late 2006 and early 2007. Dianne said Reed had sexual intercourse with her for the first time on October 8, and they were interrupted when Bahati knocked on the door of the hotel room. Dianne recalled the date because Reed had told her Bahati was getting out of jail on October 8.[3]

Dianne testified that, the next night, Reed tried to put his penis in her anus, and that it went in a little, but "didn't go all the way in." She said a couple of nights later, Reed woke her up, got up off the bed and made a circular motion with his finger that indicated to Dianne she should get up and turn around. When she bent over and put her hands on the bed, Reed put his penis in her vagina from behind. Bahati and her father were asleep in the room at the time of both these incidents.

During that same week or two-week period, while Bahati and her father were absent, Reed grabbed Dianne and put her on the bed, pulled her pajama pants down, and touched her vagina with his tongue.

---

**2**  All undesignated statutory references are to the Penal Code.

**3**  The parties stipulated that records from the Santa Rita jail indicate Bahati was in custody in Alameda County in 2006 from December 12 until December 20.

2

Dianne testified that all four of the incidents described above occurred before her 14th birthday in mid-November.

Dianne stated that the following incidents occurred after her 14th birthday:

Reed whipped her with a belt approximately 25 times after she was suspended from school, leaving bruises on her thighs and arms and a knot on her head. The next day, she did not go to school. Reed bought some new panties for her and had her model them. He then put his mouth on her vagina.

On the night of February 4, 2007, while everyone else in the room was asleep, Reed forced his penis inside Dianne's vagina. This time, Reed was rougher and it "[d]idn't feel so good." Dianne asked Reed to stop, but he did not. Afterwards, Dianne experienced pain when she closed her legs and a burning sensation while urinating.

On February 5, 2007, Dianne reported the abuse, gave a statement to police, and submitted to a sexual assault exam. Photographs of her body showed bruising on her right arm, at the bicep and forearm. The sexual assault examiner noted these bruises, as well as resolving bruises on the inside of both of Dianne's knees, a lump on her forehead, and an abrasion to her cervix. The underpants she had been wearing the night before were collected, along with vaginal and oral swabs.

Reed was arrested that evening at the hotel. Officers collected a pair of red pajama bottoms and a T-shirt from the hotel room.[4] An oral swab was collected from Reed and provided to the Oakland Police Department.

The criminalist at the Oakland Police Department Crime Laboratory who performed the DNA analysis in this case testified that sperm and epithelial cells were found on Dianne's underpants; DNA was extracted from the sperm and analyzed; and a genetic profile for the sperm was generated and compared to a known DNA profile for Reed. The profiles matched. The DNA profile of the epithelial cells matched a known DNA profile for Dianne. Sperm and epithelial cells were also found on one of the vaginal swabs. The criminalist was able to obtain a partial profile for the male donor,

---

[4] Dianne testified that she wore the same red pajama bottoms to bed every night and had not cleaned them.

3

which was consistent with Reed's reference profile. Sperm and epithelial cells were also found in two stains on the pajama pants. DNA was extracted and analyzed. The profiles were consistent with the reference profiles for Dianne and Reed.

The evidence varied as to the time period Dianne lived with Reed. Dianne testified that she moved from Reno to Oakland in September 2006, and stayed with her maternal grandmother for a couple of days. After that, she stayed a week with Reed and then went to stay with Reed's sister, Keisha. Dianne could not recall how long she stayed with Keisha but believed it was about a month or two. She then went to live with Reed again at the California Hotel, where she remained until February 5, 2007. She could not remember exactly when she returned to the hotel but said she did so before her 14th birthday.

Reed's grandmother, Lois, testified Dianne came to Oakland "around September" and stayed at her house for a few days, then went to live with Reed's sister, Keisha. Keisha testified she was "not sure" how long Dianne stayed with Lois, but it could have been "about a month" or a little shorter. Keisha said Dianne lived at her house for "[t]wo months, roughly" before she went to stay with Reed.

The parties stipulated that Dianne became enrolled in school on September 26, 2006. Keisha said she registered Dianne for school "[a]bout two weeks" after Dianne began living with her. Dianne said she was enrolled in school about a month after she arrived from Reno.

Keisha's daughter, Unique, testified that on her birthday, October 7, Dianne was living with her and Keisha. Unique remembered this because she and Dianne went to a concert for her birthday.[5] Unique said Dianne stayed at her house for "[p]robably about two months" after October 7.

Reed did not testify.

---

[5]  Dianne recalled going to a concert with Unique but said she was staying with Reed at the time.

4

## *Posttrial Proceedings*

After a verdict had been rendered, Reed's counsel filed a written motion for new trial, arguing that there was insufficient evidence for the jury to find beyond a reasonable doubt that any offenses occurred before Dianne's 14th birthday. On January 16, 2009, after the trial court considered and denied Reed's motion for new trial, Reed's counsel, Deborah Levy, indicated to the trial court that Reed wanted to file "a motion for incompetence of counsel," but she did not "know what vehicle to do." The court continued sentencing to January 30, 2009, to allow Reed and Levy to talk.

On January 30, 2009, Reed's counsel again advised the court that Reed was asking her to request a new trial "based on [her] incompetence." Levy stated she had told him "he is much better . . . off having his appellate attorney argue any issues of incompetence," but "Mr. Reed would like to make that motion. I cannot make it for him . . . . So, I am at a loss what to do." The court said, "Let's take one thing at a time" and returned to the sentencing proceeding.

Later in the sentencing proceeding, Levy stated that Reed was "again indicating . . . he wants to bring that motion regarding [her] incompetence." The court responded: "Mr. Reed, . . . [t]here are procedures of which I have to adhere to, and when you are making a motion to set aside this case based on your counsel's incompetency, she's correct, that is not something that I can take into consideration at this time. It is something [that] an appellate lawyer will review with you and will go over with you in detail what your concerns are. [¶] But at this time you are before this court for a report and sentencing, and so the purview and things that I have to take into consideration are those things that are before me, the issues that were presented to me in open court. And any dialogue you may have had with your attorney, any preparation that may have taken place for your case is something that is not in the realm of things that I am privy to. So, someone else will have to examine what she did in preparation of your case, the presentation of it, as well as my ruling. [¶] So, I am not in the position to evaluate whether she was effective counsel or not, and turn around and review whether I am making an effective decision or not. Someone else will be in a position to do that."

Thereafter, the trial court sentenced Reed under the "three strikes" law to an aggregate prison term of 230 years to life.[6]

### The Prior Appeal:  **Reed I** *(A123967)*

Reed appealed from the judgment of conviction.  Among other arguments, he asserted that "the trial court erred by failing to inquire into the reasons for his desire to move for a new trial on the basis of incompetence of counsel," and that the case must be remanded to the trial court "for a full *Marsden*[7] inquiry into the basis for [his] allegations of trial counsel's incompetence."  In *Reed I*, a panel of this court agreed. (*Reed I*, *supra*, 183 Cal.App.4th at p. 1140.)  We concluded the trial court erred in failing to make any inquiry into Reed's reasons for believing he was ineffectively assisted at trial, including the requisite *Marsden* inquiries on such issues, as required by *People v. Stewart* (1985) 171 Cal.App.3d 388 and *People v. Mejía* (2008) 159 Cal.App.4th 1081.[8] (*Reed I*, at pp. 1144-1145, 1148.)  We were unable to conclude the error was harmless beyond a reasonable doubt "because it remains impossible on this record to determine whether further inquiry would have led the court to grant a new trial motion."  (*Id.* at p. 1149.)

Accordingly, this court reversed the judgment "with directions to the trial court to make further inquiry into Reed's claim of ineffective assistance of counsel.  If, after further inquiry, the court determines good cause exists for appointment of new counsel to fully investigate and present defendant's motion for new trial, the court shall appoint new

---

**6**  The second amended information alleged that Reed had prior serious felony convictions for shooting at an inhabited dwelling (§ 246), and for battery with serious bodily injury (§ 243, subd. (d)); he had served two prior prison terms; and he had received probation for a prior conviction for sale/transportation/offering to sell a controlled substance (Health & Saf. Code, § 11352, subd. (a)).  The trial court found the allegations true.

**7**  *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

**8**  We note that the California Supreme Court later held that *People v. Mejía* "incorrectly implied that a *Marsden* motion can be triggered with something less than a clear indication by a defendant . . . that the defendant 'wants a substitute attorney.' " (*People v. Sanchez* (2011) 53 Cal.4th 80, 90, fn. 3.)

counsel for that purpose and conduct further proceedings as necessary. If, on the other hand, the court determines after further inquiry that good cause does not exist for appointment of new counsel to fully investigate and present defendant's new trial motion, the court shall rule on the motion as presented by Reed. If the court denies the motion for new trial, the court shall reinstate the judgment." (*Reed I*, *supra*, 183 Cal.App.4th at pp. 1149-1150.)

The remittitur issued on June 23, 2010.

## *Proceedings on Remand*

## **Appointment of New Counsel**

On August 13, 2010, the trial court heard Reed's *Marsden* motion in a closed session. Reed appeared with his trial counsel. The trial court asked Reed to state the basis for his claim of incompetence of counsel, specifically, the reasons he felt his counsel did not present his case adequately and the areas where she failed to represent him. Reed said Levy: (1) failed to subpoena Bahati, his "alibi witness"; (2) failed to inform the jury, as he requested, that the prosecutor had released him twice on these charges for lack of evidence; (3) was unaware of documents indicating that Reed was not a DNA match and that the People's DNA expert lied on the stand; (4) failed to call a DNA expert to rebut the People's DNA witness, as he requested; and (5) failed to object to damaging testimony from Dianne's mother.

The trial court asked Levy to respond and discuss her trial preparation. Levy said she did not interview Bahati because it was her impression Bahati "was not a friendly witness," "was a prosecution witness," and "would not have been a good witness for the defense." As to the DNA evidence, Levy said she did not have her paperwork with her but was "99.9 percent sure that there was DNA testing done and some secretions from the victim and they came back to Mr. Reed without any question." She believed Reed was referring to a DNA test that failed to establish he was Dianne's father. Levy acknowledged, "[T]here was a lot of contention between Mr. Reed and I in my attempts to get him to take the deal that was on the table prior to the trial," and "there was some tension and some disagreement," but she could not recall any specific disagreements.

7

The trial court concluded it was appropriate to appoint counsel for Reed in two areas in which it could not make a conclusive determination based upon Levy's response: the DNA results, and "whether the failure to interview the witness prior to trial in any way had a material impact on the outcome." The trial court relieved Levy and appointed Attorney Lorna Patton Brown to meet with Reed, review his case, and determine whether it was appropriate to file a motion for new trial. Notwithstanding its statements to Reed indicating counsel's representation would be limited to two issues, the trial court appears to have asked Patton Brown to investigate all of the ineffective assistance claims Reed asserted.[9]

On October 25, 2010, Patton Brown moved to withdraw as Reed's counsel, as she was resigning from the California State Bar. A different superior court judge, Judge Morris Jacobson, granted the motion and appointed Attorney Thomas Broome to represent Reed.

**Reed's Motion for New Trial**

On June 2, 2011, Broome filed a motion for new trial on Reed's behalf. The motion alleged that Reed was denied a fair trial because trial counsel failed to properly investigate the case and prepare a defense. Specifically, Reed contended trial counsel (1) failed to investigate an incident in which Dianne was allegedly found performing oral sex on a boy in a closet at the youth center (the closet incident) and (2) failed to subpoena independent witnesses to lay a foundation regarding this incident, resulting in its exclusion from evidence.[10] In a related argument, Reed alleged defense counsel failed to

---

[9]  After the trial court appointed Patton Brown, Reed added, "I want to say one more thing. It wasn't no black jurors for me to pick from either." The trial court indicated Patton Brown "will be taking a look at that."

[10]  Before trial, Reed filed a motion in limine seeking to admit evidence of Dianne's prior sexual acts, contending the lies she told about a prior sexual event impacted her credibility, and her conduct also would explain her knowledge of sex and sexual terms, lest the jury believe she could only have such knowledge if her allegations against Reed were true. In support of this motion, Levy submitted her own affidavit setting forth on information and belief Unique's expected testimony regarding the closet incident. The trial court denied the motion without prejudice, finding Reed's offer of proof was

call him to testify regarding the discipline he administered to Dianne as a result of the closet incident. Reed argued his testimony, in conjunction with evidence regarding the closet incident, would have impeached the victim's credibility by establishing her motive to falsely accuse him, particularly if it was "shown to be close in time to the delayed report to the police . . . and remote in time as to when the alleged sexual acts occurred."

Reed also alleged that Levy failed to secure the records showing when Bahati was released from jail, and failed to obtain Dianne's birth certificate to show her age at the time of the alleged incidents. Finally, Reed contended Levy failed to preserve the record on appeal regarding the composition of the jury.[11]

Reed submitted declarations from Keisha, Unique, and trial counsel. Keisha stated that some teenagers told her Dianne was giving oral sex to a boy in the closet at the youth center, but Dianne denied this. Keisha also said Dianne came home late one night and lied about where she had been; Dianne said she was at the library, but there is no library near where Keisha lived. Unique stated when she and Dianne were 14 or 15 years old, a friend at the youth center told her Dianne was giving a boy a blowjob. Unique saw Dianne getting up from her knees next to a boy who was trying to "put himself back in his pants." Unique said she then walked home with Dianne and the boy, who had his hand down the front of Dianne's pants. Unique said Dianne "was always telling [her] about her 'sex' adventures: how many boys she had sex with" and "how good their sex was." Trial counsel stated she could not recall specifically whether Reed told her he

---

inadequate, as he had submitted an affidavit from counsel, not the witness, and the affidavit permitted only "an inference that something occurred." The court did not decide whether the evidence was relevant for impeachment purposes.

[11] Reed's motion included only one of the grounds he raised at the August 13, 2010 hearing. He appears to have raised the DNA issue in an October 12, 2010 superior court habeas corpus petition, which alleged (1) the prosecution had falsified DNA evidence at trial; and (2) he had never been booked, fingerprinted, read his rights, or given a free phone call to call a lawyer when the charges against him were refiled. The superior court denied his petition on October 22, 2010, stating it asserted grounds that should have been raised in an appeal and he had failed to state a prima facie case for relief.

wanted to testify, but if he had, she "would have, for certain, without a doubt, tried very strongly to convince him to change his mind."

The People filed an opposition to the motion, contending Reed had waived his attorney-client privilege as to matters he had placed at issue in his motion and the information in trial counsel's file was not protected to the extent it related to the issues raised by Reed's motion. The People asked the trial court to review trial counsel's file in camera and make the relevant information available.

The trial court heard Reed's motion on July 8, 2011. Noting the Court of Appeal had directed it to make further inquiry into Reed's ineffective assistance claim and to appoint new counsel to investigate and present his motion for new trial if it found good cause to do so, the court stated: "So we have already passed that juncture." "Now the next level of inquiry is that good cause does exist. The court is only determining whether further proceedings are necessary at this stage. [¶] If the court determines that further proceedings are not necessary, and that after full investigation there are no grounds for a new trial, the court will then reinstate the judgment." "[We are] now at that juncture where the court is seeking to determine whether, in fact, there are grounds for new trial and the basis therein. [¶] The court has already complied with the first portion of the remittitur."

After hearing argument from Reed's counsel, however, the trial court changed course. Turning to the transcript of the January 30, 2009 sentencing hearing, the court noted that, when Levy advised the court that Reed wanted to bring a motion regarding her incompetence, "[t]he word *Marsden* and no other words were used." The court concluded, that, in advising Reed in the earlier proceedings that his "motion to set aside this case based on [his] counsel's incompetence [was] not something [it could] take into consideration" and was "something that an appellate lawyer will review with you," it "basically was referring to what we call a *Strickland* error." The trial court stated: "I believe that the Court of Appeal [in *Reed I*], in reading that portion of the transcript, rather than taking the position that it was, in fact, a motion for incompetency of counsel, seems to be indicating to this court that that was alerting the court that it was a *Marsden*

10

motion that they want — that Mr. Reed wanted to substitute counsel as opposed to incompetency. But that was perhaps based on the totality of the circumstances." The trial court noted it was to determine "what is the appropriate standard of review, what is the areas in which we must focus, and whether there is legal cause for this court to determine that a *Marsden* motion should be held. And then based on that *Marsden* motion, if it had been granted, what would have been the court's actions at that juncture . . . having already had a jury determine the defendant's guilt or innocence."

The court listed the issues Reed had raised, stating it was "distill[ing its] understanding of the topics that [it] must focus upon in terms of the *Marsden* motion." In addition to the grounds asserted in Reed's motion for new trial and affidavits, the court noted "there is some reference to [Bahati], indicating that her testimony was not sought."

After hearing argument from the People, the trial court held, "Based on the totality of the circumstances, the review of today's hearing by way of motion, declaration, affidavit and record, . . . the January 30, 2009 findings shall remain. [¶] There does not appear to be grounds to set aside that order based upon grounds for a *Marsden* motion." The court again noted "the January 30th 2009 transcript in which counsel clearly indicated that it was a motion for incompetence. [¶] And so, the court does not reach the portion of the People's motion . . . that [Reed] had waived his attorney-client privilege with regards to his motion for new trial. It is still this court's position that if there is *Strickland* error, that will take place on the appellate level. [¶] This hearing was really to determine whether there had been grounds for a *Marsden* motion . . . . [¶] Based on what I heard today, it appears a number of issues have to either do with admissibility of some items, foundational issues, and then finally perhaps tactical issues exercised by the defendant's counsel. And again, it is my position that that is something that, based on *Strickland,* would be reviewed by a higher court than this because, otherwise, we are entertaining the suggestion [in] the People's motion. And I don't believe that the directive of the Court of Appeal was to in any way invade upon the attorney-client privilege for the purpose of a new trial, but to determine whether there were grounds to substitute counsel at that juncture of the trial . . . ."

11

Reed filed a timely amended notice of appeal from the judgment.[12]

## DISCUSSION

Reed takes issue with the trial court's refusal to rule on his motion for new trial, and contends Judge Jacobson violated his right to counsel and due process by placing limitations on the scope of Broome's representation. We address each of these contentions in turn.

### I. *Reed's Motion for New Trial*

Reed contends the trial court "erred in refusing to rule on [his] new trial *Strickland* claims, as directed by this court." "Where a reviewing court has remanded a matter to the trial court with directions '. . . the trial court . . . is bound to specifically carry out the instructions of the reviewing court . . . . [A]ny material variance from the explicit directions of the reviewing court is unauthorized and void.' [Citations.]" (*Coffee-Rich, Inc. v. Fielder* (1975) 48 Cal.App.3d 990, 998; accord, *In re Candace P.* (1994) 24 Cal.App.4th 1128, 1131.) Upon remittitur, the trial court promptly complied with the first step of the court's instructions in *Reed I* by appointing new counsel to investigate Reed's allegations and decide whether to file a motion for new trial. Counsel filed such a motion, and the trial court initially noted its intent to decide the motion but changed course midstream and refused to do so, conducting a second *Marsden* inquiry instead. Reed maintains the trial court failed to comply with the direction in *Reed I* to "conduct further proceedings as necessary." To the extent Reed construes the court's instructions in *Reed I* as an unconditional mandate requiring the trial court to rule on his motion for new trial, he is mistaken. A trial court has discretion in certain circumstances not to rule on a motion for new trial based on ineffective assistance of counsel. (*People v. Cornwell* (2005) 37 Cal.4th 50, 101-102 (*Cornwell*).) In directing the trial court to "conduct

---

[12] In October 2011, Reed filed a habeas petition in this court (A133415), alleging the trial court (1) violated his Fifth and Sixth Amendment rights by not allowing him to present DNA evidence; and (2) erred in failing to contact Bahati despite knowledge of her whereabouts. The petition was denied on October 19, 2011, as both grounds relied exclusively on matters in the trial court record and could have been raised on appeal, and the petition's vague and conclusory allegations did not state a prima facie case for relief.

further proceedings as necessary," the court in *Reed I* did not purport to deprive the trial court of its discretion in this regard; it was merely directing the trial court to act as warranted in the event new counsel filed a motion for new trial.

Relying on *People v. Fosselman* (1983) 33 Cal.3d 572, Reed contends the trial court abused its discretion, in any event, in opting not to rule on his motion for new trial in the circumstances of this case. (See *id.* at p. 582 [discussing the circumstances in which a trial court should decide a motion for new trial based on ineffective assistance of counsel].) We need not decide this question because we conclude it would have been an abuse of discretion to grant Reed's motion based on his showing below. A claim of ineffective assistance of counsel requires a showing that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced his defense, depriving him of a fair trial whose result is reliable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct" and must "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." (*Id.* at p. 690.) "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (*Ibid.*) In showing prejudice as a result of the alleged performance deficiencies, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding" (*id.* at 693); "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.) A defendant must overcome "the strong presumption of reliability." (*Id.* at p. 696.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Id.* at p. 697.)

13

The DNA and the other physical evidence overwhelmingly confirmed Dianne's allegations regarding the February 4, 2007 offense and, having shown her truthfulness as to that offense, strongly supported an inference she was also being truthful as to the earlier offenses. In addition, Reed failed as a matter of law to demonstrate a reasonable probability the outcome would have been different but for the deficiencies he alleged.

## A. *The Closet Incident/Reed's Failure to Testify*

According to Reed's motion, it was his discipline that provided Dianne a motive to falsify her claims against him; Reed's reason for disciplining her was irrelevant and would not reasonably have altered the outcome. The jury heard evidence that Reed had disciplined Dianne severely near the time she reported the abuse to police, and specifically, that while he was whipping her with a belt, she wanted to kill him.[13] Trial counsel urged the jury to be skeptical of Dianne's accusations, as she had "some motivation" to make a false claim because Reed "was trying to be a disciplinarian."

## B. *Failure to Call Appellant as a Witness*

Appellant argues trial counsel performed inadequately by failing to call him as a witness, though he had informed her of his desire to testify. To the extent appellant's testimony would simply have provided a *reason* for the discipline he imposed on Dianne, it would not reasonably have altered the outcome.[14]

## C. *Failure to Secure Records*

Reed presented no evidence demonstrating that Dianne's date of birth was different than the date on which the parties relied at trial and did not show that records of Bahati's release date would have impacted the outcome, given the parties' stipulation she

---

[13] Dianne stated this occurred after she turned 14, and there was evidence the bruises were still visible the same day she reported the abuse to police.

[14] In any event, appellant did not file a declaration in support of his motion, and the only evidence to support his contention is a declaration by trial counsel, recited, *ante*, pages 9 and 10. This declaration does not confirm that appellant had told counsel he wanted to testify and relates only that if he had done so, counsel would have tried to persuade him against that course of action. Appellant cites no authority to support a contention that giving such *advice* would constitute ineffective assistance.

was released a month after Dianne's 14th birthday and Dianne's testimony this was the only time Bahati was in jail.[15]

### D. *Failure to Locate Bahati*

Reed did not assert trial counsel's failure to locate Bahati in his motion for new trial, and he presented no evidence showing what testimony Bahati would have given.[16]

### E. *Jury Composition*

Reed simply alluded to a "failure to raise issues of the jury composition, which trial counsel never presented to the court or even mentioned during jury selection" and concluded "[t]rial counsel failed to preserve the record on appeal" as to this issue. He presented no evidence regarding the jury's composition and did not make any showing he was prejudiced by the alleged failure to preserve this issue.

We conclude, accordingly, that even if the trial court erred in refusing to decide Reed's motion for new trial, he has not shown the error was reversible.

## II. *Judge Jacobson's Appointment of Substitute Counsel*

Reed contends Judge Jacobson deprived him of his right to counsel by limiting the scope of Broome's investigation of his ineffective assistance claim. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Mempa v. Rhay* (1969) 389 U.S. 128, 134 ["appointment of counsel for an indigent is required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected"].)

"[T]he right to the assistance of counsel has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process . . . ." (*Herring v. New York* (1975) 422 U.S. 853, 857; accord, *United States v. Cronic* (1984) 466 U.S. 648, 656, fn. 15 (*Cronic*).) "Government violates the right to effective assistance when it

---

[15] Broome also argued trial counsel had failed "to secure some critical records that were mentioned in the report and . . . in the trial transcript," but said he did not "know the specifics of that so I don't want to get into too much detail about that" and never identified the records to which he was referring.

[16] Broome said he had been "unable to find [Bahati] to get a declaration. She's apparently out of the area now. . . . [W]e have been diligently trying to find her . . . ."

interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." (*Strickland*, *supra*, 466 U.S. at p. 686.) Thus, " '[t]o satisfy the Constitution, counsel must function as an advocate for the defendant, as opposed to a friend of the court.' " (*Cronic*, at p. 656, fn. 17, quoting *Jones v. Barnes* (1983) 463 U.S. 745, 758, dis. opn. of Brennan, J.) Nonetheless, "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated. [Citations.]" (*Cronic*, at p. 658.)

On November 1, 2010, Judge Jacobson appointed Broome to represent Reed when Patton Brown withdrew from the case. The following exchange occurred:

"THE COURT: . . . I've had the opportunity to speak with you informally. I'm providing you with a copy of the Court of Appeal opinion. [¶] The Court of Appeal sent this back for a very, very narrow issue, which is to investigate for the trial court . . . to make an initial determination about whether there's a possible ineffective assistance of counsel claim as to a single witness in the case. And [the trial court] previously appointed Lorna Brown to do that investigation. Ms. Brown is resigning from the Bar and has now withdrawn from this endeavor. [¶] Court Appointed sent another attorney who came last Friday, Mr. Hetrick. Mr. Hetrick was unwilling to accept any limitation on his appointment whatsoever. I tried to explain to him that the Court of Appeal has defined the limits of this representation at least initially, and [the trial court] has made orders consistent with that. So Mr. Hetrick was unwilling to accept such limitations, so I declined to appoint him.[17] [¶] Mr. Broome, I've explained all that to you informally

---

**17** On October 29, 2010, Attorney Patrick Hetrick appeared before Judge Jacobson, and the following exchange occurred:

   "THE COURT: Ms. Brown had to withdraw. Mr. Hetrick, there's a very narrow issue here that needs to be looked at and investigated. Judge Thompson has asked me to keep your investigation on the narrow side. The idea would be to get to a point where the hearing could be held to resolve the issue that the Court of Appeal has asked counsel to look at. Are you prepared to accept appointment for that limited purpose?

16

and now on the record as well.  Are you prepared to accept appointment for this limited issue?

      "MR. BROOME:  I am.

      "THE COURT:  Okay.  You are appointed for that purpose. . . ."

Judge Jacobson appears to have been attempting to define the scope of Broome's representation in a manner consistent with [this court's] directions to the trial court on remand in *Reed I* and with the trial court's prior orders in the case.  To the extent he purported to limit the scope of this representation beyond [this court's] directions in *Reed I* or in contravention of constitutional principles, Reed has not established that this amounted to a violation of his right to counsel.  The record demonstrates that Judge Jacobson provided a copy of our opinion in *Reed I* to Broome, and that Broome did not limit the scope of his representation to the narrow issue defined by Judge Jacobson, i.e., "whether there's a possible ineffective assistance of counsel claim as to a single witness

---

    "MR. HETRICK:  Well, I don't know that I want my representation limited. . . .  I have not seen any of the file yet.  And there may be issues that would be outside of that.  I don't know, I just don't know.  I don't want to be put in the position of saying that I can only deal —

    "THE COURT:  You don't have authorization — I'm not going to pay you to do any work beyond what the Court of Appeal has required.  There's a single issue they have asked to be looked at whether there was ineffective assistance of counsel on that single and sole issue.  You do not have authorization to go beyond that.  [¶] If your investigation yields something you think should cause a change in circumstance, that may be.  But you are not entitled to go into ineffective assistance of counsel review on every aspect of trial.  [¶] As to one witness that was not called, that's what you are being hired for.  If you don't want to accept that I will get a new lawyer.  Court of Appeal has told us what to do, and that's what I am going to order.

    "MR. HETRICK:  . . .  I think I should be allowed an opportunity to examine what the Court of Appeal said and make my own legal judgment with regard to that.  Therefore what I would ask is I be given an opportunity to review the situation before I accept the appointment.

    "THE COURT:  . . .  I will put this matter over to Monday.  Call Court Appointed, we need a new lawyer.  [¶] I'm going to reject your appointment on this, Mr. Hetrick. . . ."

17

in the case," or, indeed, even the issues the trial court asked Patton Brown to investigate.**18**

We see no indication Judge Jacobson's instructions to Broome impacted his representation of Reed, produced unfairness in the outcome of Reed's motion for new trial, or undermined the reliability of the adversarial process. We find no merit in Reed's contention his right to counsel was violated. As the record shows, Broome did not limit his representation of Reed. Reed also cannot show prejudicial error as to his remaining arguments, and these contentions also fail.

**DISPOSITION**

The judgment is affirmed.

_____
                                          SIMONS, J.

We concur.

_____
JONES, P.J.

_____
BRUINIERS, J.

_____

**18** Reed's motion for new trial states, "It has been suggested that the Court of Appeal['s] mandate is limited to the one issue of a hearing on Mr. Reed's claim of ineffective assistance of counsel. Mr. Reed disagrees with this contention. The Court of Appeal[] notes in its holding that the [trial court] should conduct a hearing on Mr. Reed's claim of ineffective assistance of counsel and for such further proceedings as may then be required." (Boldface omitted.) He then summarizes the issues raised in the motion.